*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★  ★ ★ ★

## MEMORANDUM OPINION

No. 04-08-00691-CR

James **ZITELMAN**,
Appellant

v.

**STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CR-6699
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:         Phylis J. Speedlin, Justice
                Rebecca Simmons, Justice
                Steven C. Hilbig, Justice

Delivered and Filed: March 10, 2010

AFFIRMED

James Zitelman appeals two judgments of conviction for indecency with a child. Zitelman asserts the evidence is legally and factually insufficient to support the judgment on count one because the State failed to prove any touching was done with intent to arouse or gratify the sexual desire of any person, and is factually insufficient as to the second count. We affirm the trial court's judgments.

## BACKGROUND

In 2003, Zitelman taught theater arts at a middle school in San Antonio, and K.B., a sixth-grader, was his student. Zitelman testified the sixth-graders were scheduled to rotate through three different classes – theater arts, Spanish, and art – during the school year. K.B. testified he started the year with theater arts, and after the class was finished, wanted to stay in Zitelman's class for another rotation rather than move on to the art class. With permission from the school administration and K.B.'s mother, K.B. spent another rotation in theater arts acting as Zitelman's aide. A relationship developed between Zitelman and K.B., which K.B. described more as a friend relationship than a teacher/student relationship. K.B. also described Zitelman as his favorite teacher.

When K.B. entered the seventh grade, he was interested in taking another class with Zitelman, but K.B.'s mother wanted him to take Spanish and try football. Therefore, K.B. did not take a class with Zitelman, but he continued his friendship with Zitelman and worked as a volunteer on many projects involving Zitelman's theater classes. In the spring of 2005, Zitelman offered K.B. a small role in a play that required K.B. to wear a costume. K.B. told the jury that during the lunch period on March 4, 2005, Zitelman told K.B. that Zitelman needed to measure K.B. for the costume. K.B. testified Zitelman took him into a dressing room located near the stage and the cafeteria. Inside the room, Zitelman told K.B. to remove his pants. K.B. said Zitelman kneeled down and held a costume open for K.B. to wear. K.B. testified he stepped into the leg openings and Zitelman pulled the costume on, zipped it, and then began taking measurements. Although the measurements included measuring his inseam, K.B. testified Zitelman did not touch his crotch. However, K.B. told the jury that as Zitelman stood up he pressed his body against K.B. and squeezed K.B.'s genitals with his hand. K.B. stated he felt pressure on his genitals from Zitelman's hand. K.B. testified he backed

away from Zitelman, and felt shocked and embarrassed. Zitelman next asked K.B. to put on a pair of tights and K.B. complied. K.B. told the jury that Zitelman backed away and circled K.B. while staring at K.B.'s crotch for approximately three minutes. According to K.B., Zitelman told K.B. to remove the tights and get dressed. K.B. testified Zitelman remarked that K.B., who was wearing boxer underwear, needed to wear different underwear with the tights. K.B. asked Zitelman what he meant and K.B. testified that Zitelman dropped his pants to his knees, exposed a pair of light blue underwear, and remarked "something like these." K.B. described the underwear as tight fitting with a thin strap going around the hips.

K.B. testified that after a dress rehearsal on March 8, 2005, Zitelman asked him to stay and help straighten up. K.B. stated he went to the dressing room to change, but did not close the door completely as he and Zitelman were the only ones in the area. As he was getting dressed, K.B. testified Zitelman came into the room, knelt down and began picking up some newspapers. As Zitelman stood up, he grabbed K.B.'s "inner leg" and then moved his hand to K.B.'s genitals and began to rub them. K.B. stated Zitelman kept his hand on his genitals for approximately thirty seconds, then looked up and said, "What?" K.B. testified he used his knee to kick Zitelman's arm away and walked out of the dressing room to retrieve his bag from a chair on the stage. K.B. was "shocked" and testified that it was then that he realized what was "going on" with "those two incidents together." He testified he did not want to be around "him" (Zitelman) anymore. K.B. testified that as he was getting his bag he heard Zitelman approach from the dressing room with a tissue in his hand. Zitelman stopped in front of K.B. and used the tissue to purportedly wipe makeup from K.B.'s cheek. As he did so, Zitelman said to K.B., "God, you're so sexy." K.B. began walking, accompanied by Zitelman, to the front of the school where K.B.'s mother was waiting.

K.B. and his mother, Kelly, each testified that Zitelman spoke with Kelly and thanked her for allowing K.B. to participate in the play. Kelly testified Zitelman seemed to go "overboard" in his praise for and comments about K.B. Kelly asked K.B. about his progress report as she drove off, and K.B. realized he had left the report in his locker. Kelly pulled to the front of the school and K.B. went back into the school to retrieve his report. Zitelman was still at the front door and accompanied K.B. to his locker.[1] K.B. testified that while they were together, he asked Zitelman, "What was that back there?" According to K.B., Zitelman replied "nothing." Kelly and K.B. both testified that when K.B. and Zitelman arrived back at the car, Zitelman again thanked Kelly for letting K.B. participate in the play, and praised him for his efforts.

Kelly testified that she noticed something was wrong because K.B. was not acting in his usual manner. Kelly told the jury that usually K.B. is a "chatterbox" but he seemed "wilted." She also thought it unusual that K.B. did not say goodbye to Zitelman either time they drove away. Kelly testified that the next morning she received a call from the school's vice-principal requesting a meeting with K.B. and the school principal. Kelly and K.B. went to the principal's office where Kelly was first made aware of a complaint made by Zitelman that K.B. had exposed himself to Zitelman the previous evening. The principal, Ms. Nancy Pena, testified K.B. was brought in and asked twice whether "anything" had happened the previous night. K.B. stated both times that nothing had happened. Pena then allowed K.B. to read Zitelman's written statement. In the statement, which was introduced into evidence, Zitelman accused K.B. of complaining that K.B.'s "thingy" hurt, and K.B. had pulled down his pants to expose his briefs. Zitelman stated that the top

---

[1] Zitelman testified he was required to escort students to the locker when the school was closed.

half of K.B.'s boxers were "tenting outward with an erection inside." In the statement, Zitelman said he told K.B. that he (Zitelman) could not touch him, and that K.B. needed to take his complaint to his mother or his doctor. Pena testified that after reading the statement, K.B. laid the document on the desk and denied the allegations made by Zitelman. Pena testified that K.B. went on to relate the two incidents where Zitelman had touched his genitals.

Pena told the jury about the phone call she received from Zitelman the evening of March 8, 2005. During the conversation, Zitelman accused K.B. of exposing his underwear to Zitelman while telling Zitelman his "thingy" hurt. Pena instructed Zitelman to prepare a written statement and also meet with her the next morning before meeting with K.B. and his mother. Zitelman admitted he talked with K.B.'s mother after the exposure but did not mention either the incident or the complaint made by K.B. about his penis. Pena told the jury that school policy requires a teacher to notify a parent if a student complains of an illness or physical ailment to a teacher. When she questioned Zitelman about the failure to follow this policy, Zitelman's only explanation was that he was nervous and upset and did not know what to say to K.B.'s mother.

Mr. Grantley Boxill, an employee relations officer for the school district, also testified about statements Zitelman made to him during Boxill's investigation undertaken on behalf of the school district. Boxill testified Zitelman claimed that when he saw K.B.'s erection he started to recall when he was six or seven years old and was sexually assaulted by older males. Zitelman told the investigator that he thought K.B. was going to assault him and he felt threatened.

The State also introduced evidence that the police seized a pair of light blue, bikini style underwear from Zitelman's residence on April 20, 2005. Zitelman's roommate testified the underwear belonged to Zitelman.

Zitelman testified and contradicted much of K.B.'s testimony. Zitelman admitted he took K.B.'s measurements for a costume on March 4, 2005, but denied being in the dressing room when this took place. Zitelman told the jury he measured K.B. in the seven-foot wing area just left of the stage and he did not touch K.B.'s genitals. He also testified that K.B.'s costume for the play had not been constructed by then and K.B. did not try on the costume. Zitelman's roommate also testified that no costume existed on March 4, 2005. Zitelman testified he did ask K.B. to put on a pair of tights, but stated K.B. went into the dressing room alone to change. Zitelman admitted he told K.B. to wear a different style of underwear because boxers "bulk up" under tights. He also admitted he lowered the side of his pants one and one-half to three inches and showed K.B. part of his underwear.

As to K.B.'s testimony about the incident after the dress rehearsal, Zitelman told the jury that the events occurred as he outlined in his written statement to Pena. Zitelman testified he was cleaning up from the dress rehearsal and thought all the students had left. He went into the dressing room and was shocked to find K.B. As Zitelman was cleaning some papers from the floor, K.B. told him his "thingy" hurt. Zitelman testified he told K.B. to talk to his doctor or mother because "I can't touch you." Zitelman stated he turned around and saw that K.B. had pulled his pants down, exposing his boxers, and that K.B. had an erection. Zitelman testified he told K.B. once again that he could not touch him and to get dressed. He escorted K.B. to the front of the school where K.B.'s mother was waiting. Zitelman testified he spoke with K.B.'s mother, thanking her for allowing K.B. to participate in the play. He agreed that K.B.'s mother drove off but came back right away because K.B. left his progress report in his locker. Zitelman testified he accompanied K.B. to his locker and then back to the front and that K.B. never said anything to him during this time. Zitelman

acknowledged he did not disclose to K.B.'s mother her son's improper conduct but stated it was due to his desire to follow school policy. Zitelman testified he believed K.B.'s conduct amounted to sexual harassment.

Zitelman was charged in two counts with indecency with a child, one for the March 4th incident and one for the March 8th incident. Each count alleged Zitelman engaged in sexual contact with K.B., a male child then under the age of seventeen years and not his spouse, by touching part of the genitals of K.B., and Zitelman acted with the intent to arouse and gratify the sexual desire of any person.

## SUFFICIENCY OF THE EVIDENCE

### *Applicable Law*

We review the evidence for legal sufficiency by looking at all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App.), *cert. denied*, 546 U.S. 962 (2005). We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In reviewing the factual sufficiency of the evidence, we look at the evidence in a neutral light, and ask whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. *Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). We must defer to the jury's determination of the weight to be given to contradictory testimonial evidence because resolution of the conflict is often determined by an evaluation of credibility and demeanor by the jurors who were present when the testimony was given. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). We "must be cognizant of the fact

that a jury has already passed on the facts and must give due deference to the determinations of the jury in order to avoid substituting our judgment for that of the jury." *Lancon v. State*, 253 S.W.3d 699, 704 -705 (Tex. Crim. App. 2008). To reverse we would have to find that the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417.

"[T]he requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981). An expression of intent by words is not required. *Navarro v. State*, 241 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

### *Discussion*

As to count one, Zitelman first contends the evidence is legally insufficient to prove that any touching was done with the intent to arouse or gratify the sexual desire of any person. Count one arose out of the incident that occurred while Zitelman was measuring K.B. on March 4, 2005. Zitelman argues the evidence is legally insufficient on the intent element because he denied the touching, K.B. thought the touching was a mistake as he was being fitted for his costume, and it only lasted mere seconds. Zitelman misconstrues K.B.'s testimony. K.B.'s testimony after describing Zitelman squeezing his genitals was as follows:

> Q.     Can you tell the jury what you were thinking as a result of what just happened?
> A.     Little shocked, embarrassed, a little – I mean, I was trying to figure out what happened, if maybe that it had been an accident or he just – it was just shock and nervous and embarrassment [sic] were going through my mind at that time.

This testimony does not indicate K.B. thought Zitelman's action was a mistake; rather, it indicates K.B. was confused and questioned whether it was possibly an accident. Furthermore, in relating the second episode on March 8, 2005, K.B. testified he had "finally kind of realized what was going on

in those two events, those two incidents put together, I realized what was going on." Taking into consideration all of the circumstances of Zitelman's conduct toward K.B., including the "you're so sexy" comment, their relationship, and the act itself, the jury could have inferred Zitelman's intent. *See McKenzie*, 617 S.W.2d at 216. Viewing the evidence in the light most favorable to the jury's verdict, a rational jury could have concluded Zitelman touched the complainant's genitals with intent to arouse or gratify his sexual desire.

Zitelman also asserts the evidence is factually insufficient to support a conviction on count one. Zitelman argues there simply is not enough evidence to support a reasonable inference that the touching, under any versions of the events, was done with the intent to arouse or gratify sexual desire of any person. However, viewing the evidence in a neutral light, and giving the proper deference to the jury's findings, we cannot find that the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417.

Finally, Zitelman asserts the evidence is factually insufficient to support a conviction on count two, which arose out of the incident after the rehearsal on March 8, 2006. Zitelman does not identify any specific element of the offense that lacks sufficient evidence; instead, he argues his version of what occurred was more credible than that of the State's witnesses. We interpret this argument as a general attack upon the complainant's credibility. But as explained above, we are not to substitute our credibility choices for those of the jury. *Lancon*, 253 S.W.3d at 704 -705. Zitelman does not point to any evidence other than his own testimony from which we are to conclude the verdict on count two is against the great weight and preponderance of the evidence. We hold the evidence is factually sufficient to support a verdict on count two.

## CONCLUSION

The judgments of the trial court are affirmed.

Steven C. Hilbig, Justice

DO NOT PUBLISH